UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

| | | |
|---|---|---|
| MARSHA CRISHON, | : | Case No. 3:11-cv-00392 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND REVERSED;
AND (2) JUDGMENT IS ENTERED IN FAVOR OF PLAINTIFF
AWARDING BENEFITS**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to disability insurance benefits and Supplemental Security Income.

*See* Administrative Transcript, Doc. 6, Ex. 2, ("Tr.") (Tr. 24) (ALJ's decision).

**I.**

On December 14, 2006, Marsha Crishon filed an application for disability

insurance benefits ("DIB") and supplemental security income ("SSI").  (Tr. 12).  Plaintiff

alleges a disability onset date of July 26, 2006.  (*Id*.)  Specifically, she claims that she was

no longer able to work due to the residuals of a July 26, 2006 automobile accident which

caused chronic pain in her neck, back, right arm, and right leg.  (*Id*.)  Plaintiff later

reported that she suffered from many psychological impairments including Post

Traumatic Stress Disorder, Depression, Dysthymic Disorder,[1] and auditory and visual hallucinations. (Doc. 6, Ex. 9 at 33; Ex. 8 at 12).

Plaintiff's applications for DIB and SSI were denied initially and upon reconsideration. (Tr. 9, 12). A hearing concerning the denials was held on September 22, 2009, before an ALJ. (Tr. 12). The ALJ issued her decision on December 31, 2009, finding that Plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (Tr. 24). The ALJ determined that Plaintiff retained the ability to engage in a range of medium work that allowed her to perform a significant number of jobs in the economy.[2] (Tr. 19-23). The Appeals Council denied review, giving the ALJ's decision the effect of a final decision by the Commissioner of Social Security. (Tr. 2). Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Tr. 7).

Plaintiff is 57 years old. (Tr. 22). She has an eleventh grade education. (Tr. 14). She received her nurse's certification in 1998. (Doc. 6, Ex. 6 at 16). Her past relevant work includes: home health aide, nurse assistant, retail associate, chef, dishwasher, and sandwich maker. (*Id*., Ex. 2 at 54).[3]

---

[1] Dysthymic disorder is a chronic depressive disorder similar to, but less severe than, Major Depressive Disorder.

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[3] Plaintiff alleged whole years in which she did not work, including: 1986, 1992, 1993, and 2006. (Tr. 144). Additionally, records show that she made some money, but less than $3,000 annually, in 1983, 1985, 1987, 1989, 1990, 1991, 1994, 1997, 1998, and 2000. (Tr. 125).

The ALJ's "Findings," which represent the rationale of her decision, were as

follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since July 26, 2006, the amended alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine; degenerative disk disease of the lumbosacral spine; dysthymia; and posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds claimant has the residual functional capacity[4] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). Giving the claimant the full benefit of doubt with regard to her allegations and subjective complaints, it is found that she is limited to low stress work that would require only occasional overhead lifting with both upper extremities. She is further limited to jobs that would require no more than minimal contact with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 4, 1955 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

---

[4] Residual Functional Capacity ("RFC") is defined as "the most the claimant can still do despite his or her limitations." *Cox v. Comm'r of Soc. Sec.*, 295 Fed. Appx. 27, 32 (6th Cir. 2008).

-3-

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding the claimant is "not disabled," whether or not the claimant has transferrable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-23).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by sections 216(i) and 223(d) of the Social Security Act and was therefore not entitled to DIB.  (Tr. 24).  Furthermore, the ALJ found that Plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act, making her ineligible to receive SSI.  (*Id.*)

On appeal, Plaintiff argues that: (1) the ALJ erred in rejecting the opinions of Plaintiff's treating physicians and psychiatrists; and (2) the ALJ erred in not finding Plaintiff credible.  (Doc. 7 at 1).  The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is

-4-

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). Further, "[s]ubstantial evidence is more than a scintilla of evidence but less than a preponderance...." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). The Sixth Circuit explained:

> The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*

The claimant bears the ultimate burden to prove, by sufficient evidence, that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

_**Medical History**_

Plaintiff's physical and mental health records following the onset of the alleged disability are set forth chronologically as follows:

On August 17, 2006, Plaintiff saw Dr. Aivars Vitols, an orthopedic surgeon.  (Doc. 6, Ex. 7 at 52).  Plaintiff had complaints of neck pain, daily headaches, and dizziness. (_Id._)  She used a walker, wore a cervical collar, and on exam she exhibited a "very slow and stiff gait."  (_Id._ at 52-53).  She had some decrease of range of motion in her shoulders bilaterally.  (_Id._ at 53).  The diagnosis was probable cervical sprain and strain, though Dr. Vitols noted that the physical examination was unremarkable.  (_Id._)  Plaintiff was referred to physical therapy.  (_Id._)

At a September 18, 2006 follow up examination with Dr. Vitols, Plaintiff no longer wore the cervical collar but still used a walker.  (Doc. 6, Ex. 7 at 51).  The orthopaedist was unable to explain all of Plaintiff's symptoms.  (_Id._)  Dr. Vitols recommended that Plaintiff be seen by a neurosurgeon and continue with therapy.  (_Id._)

Medical documents from Dr. Martin Schear indicate that Plaintiff was treated for complaints of chronic neck and low back pain resulting from her automobile accident. (Doc. 6, Ex. 8 at 143, 151).  In response to early complaints of headaches, Dr. Schear ordered an EEG in November 2006, the results of which were negative.  (_Id._, Ex. 7 at 60). In November 2006, an MRI scan of the brain was obtained for complaints of dizziness;

the study was also essentially negative. (*Id.* at 71). Due to her ongoing complaints of neck and low back pain, two additional MRI scans were conducted in November of 2006. (*Id*. at 67, 69). Both scans showed multilevel degenerative disk disease with mild disk bulges. (*Id.*)

On November 16, 2006, Dr. Schear completed a Medication Dependency form where Plaintiff's medical conditions were listed as cervical and lumbar strains. (Doc. 6, Ex. 7 at 62). Clinical findings included tender cervical and lumbar spine. (*Id*. at 65). Dr. Schear's report showed that Plaintiff's standing, walking, and sitting were affected. (*Id.* at 66). She could frequently and occasionally lift eleven to twenty pounds, but ability to push/pull, bend, and perform repetitive foot movements was moderately limited. (*Id*.) She was considered unemployable for between thirty days and nine months. (*Id*.)

Dr. Alan Jacobs, a neurologist, evaluated Plaintiff on November 27, 2006 at the request of Dr. Vitols. (Doc. 6, Ex. 7 at 74). During this evaluation, Plaintiff complained of dizziness, impaired thinking episodes, decreased hearing episodes, and unsteadiness. (*Id*.) On exam, she had increased tone and tenderness of the posterior cervical spine, limited range of motion of the cervical spine, slightly widened base gait, positive Romberg[5] with unsteadiness, inability to tandem walk with eyes closed, and decreased sensation in lower extremities. (*Id.* at 75). Dr. Jacobs reported "the possibility of a postconcussive syndrome and quite possibly secondary development of an underlying

_____

[5] A positive Romberg result is indicative of a balance impairment associated with damage to the cerebellum.

partial seizure" resulting from the accident.  (*Id*.)  He found that Plaintiff had an unsteady gait, sensory loss to her lower extremities, and problems with comprehension and hearing since her accident.  (*Id*.)  The intensity and persistence of her symptoms were consistent with the degree of physical findings.  (*Id*. at 73).

Dr. Giovanni Bonds, a psychologist, evaluated Plaintiff on March 1, 2007.  (Doc. 6, Ex. 7 at 77).  The history indicates that Plaintiff lived with a roommate, had never been married, and had three adult children.  (*Id*.)  She was in foster care from age four to nine, but was otherwise raised by her mother when her mother's health allowed it.  (*Id*.) Plaintiff was physically and sexually abused in foster care.  (*Id*. at 78).  Her relationship with her sisters had become strained after her car accident.  (*Id*.)  She considered her mother to be her closest friend and professed not to have any others.  (*Id*.)  Prior to her accident, she was taking GED classes.  (*Id*.)

During the evaluation, Plaintiff was cooperative and exhibited pain behaviors. (Doc. 6, Ex. 7 at 79).  Her mood was depressed and she cried at times.  (*Id*.)  She was reportedly "very dissatisfied with her life."  (*Id*.)  Plaintiff was observed to be tense, alert, and partially oriented.  (*Id*.)  She had problems with cognitive testing and her intelligence was thought to be in the borderline range.  (*Id*.)  She had poor insight, judgment, and reasoning abilities and had problems living independently.  (*Id*. at 80, 82).  Dr. Bonds stated:

> Her math performance was very poor and she displayed very
> poor comprehension, judgment, and reasoning abilities.  She
> was very slow to answer questions during the cognitive
> assessment and showed more anxiety during this aspect of the
> interview….

(*Id*. at 82-83).

Dr. Bonds' diagnosis was Major Depressive Disorder and Post Traumatic Stress

Disorder.  Plaintiff's GAF was 50.[6]  (*Id*. at 83).  The doctor further stated that Plaintiff's

ability to relate to others was moderately limited and "[s]he would have difficulty

handling criticism and dealing with interpersonal conflicts at work."  (*Id*. at 84).  He also

stated that her ability to understand, remember, and carry out instructions was moderately

limited, and that she had poor cognitive abilities that might have resulted from depression

and anxiety.  (*Id*.)

Dr. Robelyn Marlow, a non-examining psychologist, reviewed the record on

March 5, 2007.  (Doc. 6, Ex. 7 at 87).  She reported that Plaintiff was moderately

restricted in her daily activities, social functioning, and in her ability to maintain

concentration, persistence, or pace.  (*Id*. at 97).  Plaintiff was also moderately limited in

her ability to understand, remember, and carry out detailed instructions; maintain attention

and concentration for extended periods; complete a normal workday and workweek

---

[6] GAF is a "Global Assessment of Functioning," which is a numerical scale from 0 to 100
measuring the psychiatric functionality of a patient.  A higher score denotes greater functionality.
A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals,
frequent shoplifting) or any serious impairment in social, occupational, or school functioning
(e.g., no friends, unable to keep a job).

without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions; and respond appropriately to criticism from supervisors. (*Id.* at 101).

Dr. Elizabeth Das, a non-examining physician, reviewed the record on March 17, 2007. (Doc. 6, Ex. 7 at 106). Based on the record, she submitted that Plaintiff had an RFC to perform medium work activity. (*Id.* at 107). She could occasionally climb ramps and stairs, but was never to climb ladders, ropes, and scaffolds. (*Id.* at 108). She was to avoid work hazards such as heights, machinery, or commercial driving due to dizzy spells. (*Id.* at 110).

Plaintiff was seen at Samaritan Behavioral Health on May 14, 2007 as a self referral. (Doc. 6, Ex. 8 at 19). She was unemployed and homeless at the time and was allegedly a victim of incest by her brothers. (*Id.* at 16). She claimed a history of hearing voices for the past four years and was observed to be crying during portions of the assessment. (*Id.*) The diagnosis was Depressive Disorder. (*Id.* at 17). She was referred to Daymont Behavioral Health Care for psychiatric evaluation and mental health counseling under Dr. Stephanie Ackner. (*Id.* at 18).

On June 4, 2007, Plaintiff had her initial psychiatric evaluation performed by psychiatrist Dr. Ackner. (Doc. 6, Ex. 8 at 12). Plaintiff related a long history of sexual and physical abuse and a history of hearing voices since childhood. (*Id.*) Plaintiff was

-10-

observed to be withdrawn with slowed speech and avoidant behaviors.  (*Id*. at 13).  Her mood was depressed and her affect was flat.  (*Id*. at 14).  Her memory, attention, and concentration were observed to be in the borderline to average range.  (*Id*.)  The diagnosis was Post Traumatic Stress Disorder, Depressive Disorder, and Major Depressive Disorder.  (*Id*.)  Plaintiff's GAF was 45.  (*Id*.)

Subsequent observation on June 20, 2007 showed a flat and tearful affect, and some "possible thought blocking."  (Doc. 6, Ex. 8 at 8).  Dr. Ackner found that Plaintiff was extremely limited in her ability to understand, remember, and carry out detailed instructions; complete a normal workday or workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Doc. 6, Ex. 7 at 114).  She was markedly limited in her ability to understand, remember, and carry out simple instructions; remember locations and work-like procedures; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; and travel in unfamiliar places or use public transportation.  (*Id*.)  Dr. Ackner further noted:

> Ms. Crishon is suffering from significant depressive, anxious, and psychotic symptoms which are impairing her ability to function each day.  She is seeking treatment and keeping regular appointments.  At this time she is impaired emotionally & cognitively, unable to work at this time.

(*Id*. at 115).  Plaintiff was considered unemployable for between nine and eleven months.  (*Id*.)

On June 25, 2007, Plaintiff underwent an assessment at Daymont Behavioral Health Care.  (Doc. 6, Ex. 8 at 76).  She related symptoms of "constant worry, irritable, trouble sleeping, feeling sad, low energy, feeling worthless and guilty for no reason."  (*Id*.)  She claimed she had panic attacks, a fear of leaving her home, and paranoid thoughts.  (*Id*. at 81).  The diagnosis by Ms. Debra Savage, a Daymont therapist, was Schizophrenia, Social Phobia, and Major Depressive Disorder.  (*Id*. at 85).

At a June 27, 2007 followup exam, Plaintiff was still hearing voices at night, although they were less troublesome than previous hallucinations.  (Doc 6, Ex. 8 at 10).  Her affect was dysphoric[7] and constricted and her GAF was 50.  (*Id*. at 11).  Plaintiff was discharged from treatment on June 28, 2007 with a GAF of 55.[8]  (*Id*. at 6).

Plaintiff's physician, Dr. Scott Shaw, completed a medical evaluation on June 28, 2007.  (Doc. 6, Ex. 8 at 2).  He noted that Plaintiff had an unusual affect, an ataxic gait,[9] post concussion syndrome, cervical strain, anxiety, depression, dizziness, and psychosis.  (*Id*.)  Her condition was listed as poor but stable.  (*Id*.)  Dr. Shaw noted that Plaintiff

---

[7]  Dysphoria is an emotional state characterized by anxiety, depression, and restlessness.

[8]  A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[9]  Ataxic gait is characterized by unsteady, uncoordinated walking with legs widened and feet pointed outward.

could stand, walk, and sit for half an hour, and do so uninterrupted for one quarter of an hour. (*Id*. at 3). She could frequently lift/carry up to five pounds, but was extremely limited in her ability to push/pull, bend, reach, handle, and perform repetitive foot movements. (*Id*.) She was moderately limited in her ability to speak. (*Id*.) Dr. Shaw opined that Plaintiff was unemployable for twelve months or more. (*Id*.)

On July 10, 2007, Dr. Bruce Goldsmith, a non-examining psychologist, reviewed the record. (Doc. 6, Ex. 8 at 21). Dr. Goldsmith affirmed the RFC given by Dr. Marlow, and opined that Plaintiff may benefit from a low stress work environment with superficial contact with people. (*Id*.; Ex. 7 at 103).

The record was reviewed on July 13, 2007 by Dr. Jerry McCloud, a non-examining physician. (Doc. 6, Ex. 8 at 22). Dr. McCloud affirmed the RFC given by Dr. Das. (*Id*.; Ex. 7 at 107).

On January 30, 2008, Daymont treatment notes showed Plaintiff had depression and social anxiety, but was improving. (Doc. 6, Ex. 9 at 44).

Dr. Townsend Smith, a pain specialist, evaluated Plaintiff on February 13, 2008. (Doc. 6, Ex. 7 at 101). His examination showed diffuse pain in the cervical spine and lumbar spine radiating into her extremities. (*Id*.) The diagnosis was cervical stenosis and lumbar degenerative disc disease.[10] (*Id*. at 103). Plaintiff received multiple pain injections from Dr. Smith during the following two months. (*Id*. at 97-100).

---

[10] Cervical stenosis is a constriction in the spinal canal which causes an impairment of neurological functions.

On February 26, 2008, Daymont treatment notes showed Plaintiff had a less depressed mood and positive response to medication. (Doc. 6, Ex. 9 at 42). An April 23, 2008 examination showed Plaintiff was depressed and tearful, and her affect was blunted and depressed. (*Id*. at 40). Plaintiff reported that pain injections had stopped working and that she was having panic attacks. (*Id*. at 39). On May 21, 2008, her psychiatrist reported that her depression had significantly improved on medication, but her affect was still blunt and auditory hallucinations persisted. (*Id*. at 38).

On May 28, 2008, Dr. Philip Minella, a neurosurgeon, examined Plaintiff. (Doc. 6, Ex. 7 at 105). Plaintiff had normal muscle strength in both upper extremities, but decreased reflexes in the right upper extremity. (*Id*.) When seen for follow up in July 2008, Dr. Minella noted that electro-diagnostic studies of both upper and lower extremities had been normal. (*Id*. at 104). Dr. Minella related that surgery was the only remaining recourse for mitigation of Plaintiff's pain. (*Id*.)

Treatment notes from a pain specialist, Dr. Bruce Kay, on July 13, 2009, indicate that Plaintiff was treated for total body pain. (Doc. 6, Ex. 7 at 152). On physical examination, Waddell's signs were positive, indicative of symptom exaggeration.[11] (*Id*.) The physician's diagnostic impression was fibromyalgia. (*Id*.) Plaintiff was noncompliant with treatment: urine drug screens were routinely inconsistent, with the claimant either testing positive for medications that Dr. Kay had not prescribed or testing

---

[11] Positive Waddell's signs denote a painful reaction to stimuli which would typically be benign. This can indicate malingering tendencies in patients claiming low back pain.

negative for medications that he had prescribed. (*Id*. at 154, 164, 167).

On July 10, 2008, Daymont treatment notes showed Plaintiff reported depression. (Doc. 6, Ex. 9 at 33). The diagnosis was Post Traumatic Stress Disorder and Dysthymic Disorder. (*Id*.) On July 25, 2008, her psychiatrist noted she was depressed, sad, nervous, and anxious. (*Id*. at 30). At an August 14, 2008 examination, Ms. Savage reported that Plaintiff was less depressed and paranoid and had more active speech, though she became tearful when talking about losing relatives. (*Id*. at 29). On January 2, 2009, her psychiatrist noted that she was "very depressed, sad, and tearful." (*Id*. at 23). On March 23, 2009, Plaintiff was still having "a hard time" dealing with the death of her daughter. (*Id*. at 18). On April 30, 2009, she was observed to be more depressed and unstable; was having auditory hallucinations; and had suicidal ideation. (*Id*. at 15).

Dr. Oscar Cataldi, a psychiatrist, evaluated Plaintiff on June 3, 2009. (Doc. 6, Ex. 9 at 10). Plaintiff was observed to be withdrawn, preoccupied, avoidant, mistrustful, and slowed. (*Id*. at 11). The diagnosis was Post Traumatic Stress Disorder and Major Depressive Disorder. (*Id*.)

Ms. Savage completed an interrogatory on September 10, 2009 which was joined by Dr. Cataldi on December 2, 2009. (Doc. 6, Ex. 9 at 55). They noted that Plaintiff was unable to perform ten work-related functions. (*Id*. at 51-55). Dr. Cataldi related, "[Client's] severe depression [and] psychotic symptoms prevents her from leaving her home except for doctors & therapy appointments." (*Id*. at 51). Dr. Cataldi stated,

-15-

"[Client] is severely emotionally impaired [with] diagnosis of major depression [with] Psychotic symptoms—long time duration." (*Id*. at 55). He also stated, "Client has poor focus [and] concentration [and] [c]lient has psychotic episodes that affect ability to function." (*Id*. at 54). Dr. Cataldi later notes: "Client is frequently labile, severely depressed, and suffers from auditory [and] visual hallucinations [and] [c]lient remains socially isolated related to depression and paranoid thinking." (*Id*. at 53). It was also noted, "[Client] is frequently distracted by internal stimuli." (*Id*. at 52). She also had "a low tolerance to stress." (*Id*.) Dr. Cataldi went on to rate her abilities to engage in basic work-related functions from a mental standpoint as either "good" or "fair" in all categories. (*Id*. at 56).

**B**

Plaintiff alleges that the ALJ erred in rejecting the opinions of her treating physicians and psychiatrists.

A treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527 (d)(2).[12] *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical

---

[12] *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone.).

opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2). When a medical source opinion is not entitled to controlling weight, an ALJ will evaluate the factors in 20 C.F.R. § 404.1527(d) (length, nature, and extent of treatment relationship; supportability; consistency; and specialization) when determining the weight to give an opinion.

The Social Security regulations recognize the importance of longevity of treatment, providing that treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). A consultative physician's assessment does not constitute *substantial evidence* so as to overcome the properly supported opinions of treating physicians. *Lashley v. Sec'y of Health & Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).

-17-

Dr. Cataldi, Plaintiff's treating psychiatrist, is entitled to controlling weight.  Dr. Cataldi stated that "Client has poor focus [and] concentration [and] [c]lient has psychotic episodes that affect ability to function."  (*Id.* at 54).  Dr. Cataldi later notes: "Client is frequently labile, severely depressed, and suffers from auditory [and] visual hallucinations [and] [c]lient remains socially isolated related to depression and paranoid thinking."  (Doc. 6, Ex. 9 at 53-55).  Ultimately, Dr. Cataldi determined that "Pt. Is severely emotionally impaired [with] diagnosis of major depression [with] Psychotic symptoms – long time duration."  (Tr. 548).

The Commissioner claims that Dr. Cataldi's opinions are internally inconsistent, because he reported that Plaintiff was unable to engage in competitive employment due to her psychiatric symptoms (Tr. 17, 543-546), but that when asked to rate her work related abilities, rated her as "fair" (Tr. 17, 547-549).  However, fair was defined in the interrogatories as the "[a]bility to function in this area is seriously limited, but not precluded."  (Tr. 549).  Moreover, SSR 85-15 states:

> The basic mental demands of competitive remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational case.

Thus, SSR 85-15 does not require that a claimant be precluded from an activity, only that she has a substantial loss of ability.  And here, Dr. Cataldi's opinion supports a finding that Plaintiff has a substantial loss in her ability to perform the basic demands of competitive, remunerative, unskilled work.  The overwhelming evidence supports a finding that Plaintiff could not perform all of the basic mental demands of competitive work activity.  For example, Dr. Cataldi related that "Ct's severe depression [and] psychotic symptoms prevents her from leaving her home except for doctors & therapy appointments."  (Tr. 544).  Accordingly, the ALJ erred in relying on the customary usage of the word "fair" rather than the definition of the word given in the interrogatories.

Dr. Cataldi's opinion is further supported by Dr. Shaw, Plaintiff's treating physican.  Dr. Shaw reported that Plaintiff had depression and psychosis and was unemployable for twelve months or more.  (Doc. 6, Ex. 8 at 2).  As a physician, Dr. Shaw is an acceptable medical source and can give an opinion as to Plaintiff's mental impairments.  20 C.F.R. 404.1513(c)(2).  The fact that Dr. Shaw is not a mental health expert is only one of the factors to be considered and not a reason to outright reject his opinion concerning Plaintiff's mental impairments.  20 C.F.R. § 404.1527(d).

The ALJ discounted the opinions of Drs. Schear and Ackner because of their durational statements.

Although Drs. Schear and Ackner found that Plaintiff's disability might last less than twelve months, neither doctor could determine with certainty if and when Plaintiff would cease to be disabled.[13] [14]  Moreover, the doctors' durational opinions do not preclude a finding that Plaintiff was not disabled for a longer time period.  In fact, the overwhelming evidence supports a finding that she was continuously disabled for more than 12 months.

For example, on her Adult Diagnostic Assessment on June 25, 2007, Plaintiff was observed to be depressed with blocked thought processes.  (Tr. 352).  She lacked coping skills and adequate social, occupational and financial support; was depressed; had anxiety, and had post traumatic stress disorder.  (Tr. 415).  She related a long history of sexual and physical abuse and a history of hearing voices since childhood.  (Doc. 6, Ex. 8 at 12).  She had no significant change in her condition until April 23, 2008, when her

---

[13]     On November 16, 2006, Dr. Schear opined that Plaintiff was unemployable for between thirty days and nine months.  (Tr. 277).  He opined that she was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 274).

[14]     Dr. Ackner reported Plaintiff "is suffering from significant depressive anxious and psychotic symptoms which are impairing her ability to function each day.  She is seeking treatment and keeping regular appointments.  At this time she is impaired emotionally and cognitively.  Unable to work at this time."  (Tr. 326).

treating psychiatrist reported that she was tearful, more depressed, had a blunted affect, and appeared to be disassociating.  (Tr. 532-535, 537).  Although she experienced some improvement on May 21, 2008, her affect was still blunted, and on subsequent treatment visits, she had no significant change.  (Tr. 531-532).  Office notes show that she was depressed, sad, nervous, anxious, paranoid, and tearful.  (Tr. 502, 507-509, 511, 513, 516, 518-519, 521-22, 524, 526).  On April 30, 2009, Plaintiff was observed to be more depressed and unstable and was having auditory hallucinations and suicidal ideation. (Doc. 6, Ex. 9 at 15).  Accordingly, it was clear error for the ALJ to ignore the record as a whole when discounting the opinions of Drs. Schear and Ackner.[15]

Because the ALJ failed to accord any significant weight to the opinions of the treating physicians in this case, her findings, which rely on the examining physicians, to the exclusion of the treating physicians, is without substantial evidence in the record. While the ALJ is a fact finder, she is not a medical doctor.  "[A]n ALJ must not substitute his own judgment for a physician's opinion without replying on other evidence or authority in the record."  *Clifford v. Apfel*, 227 F.2d 863, 870 (7th Cir. 2000).  The non-examining physicians' assessments do not constitute *substantial evidence* so as to

---

[15]    The Commissioner also discounted the opinion of Dr. Ackner because she "was not a treating physician as she had seen Plaintiff only twice prior to her June 20, 2007 assessment." (Doc. 10 at 6).  The Commissioner  also contends that Dr. Ackner gave little support for her findings.  However, the ALJ did not give these reasons for rejecting Dr. Ackner's opinion in the decision.  This is post hoc rationalization by the Commissioner.  The Court reviews the decision of the Commissioner on the rationale and findings provided by the ALJ, not on any new rationale that might be provided on appeal.  *United States Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519 (D.C. Cir. 1978).

overcome the findings of Drs. Cataldi and Shaw. Therefore, the proof of disability is overwhelming and opposing evidence is lacking in substance.[16]

### III.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987).

The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176; *see also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 772 F.2d 966, 973 (6th Cir. 1985). Such is the case here.

---

[16] Based on this finding, the Court need not address Plaintiff's second assignment of error.

Here proof of disability <u>is</u> overwhelming and remand will serve no purpose other than delay.  As fully recited herein, in view of the extensive medical record of evidence of disability, and the credible and controlling findings and opinions of Drs. Cataldi, Shaw, Schear, and Ackner, proof of disability is overwhelming.

### IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner, that Plaintiff was not entitled to disability insurance benefits and supplemental security income beginning July 26, 2006, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**, and it is **REVERSED**; and this matter is **REMANDED** to the ALJ for an immediate award of benefits.

Date:  8/30/12                                    *s/ Timothy S. Black*
                                                  Timothy S. Black
                                                  United States District Judge